Deon M. MADDOX and Lamar
M. Davis, Appellants,

v.

UNITED STATES, Appellee.

Nos. 97–CF–1670 & 97–CF–1773.

District of Columbia Court of Appeals.

Argued Oct. 6, 1999.
Decided Feb. 3, 2000.

William S. Rhyne, McLean, VA, appointed by the court, for appellant Maddox.

William P. Barry, with whom Mark J. Rochon, Washington, DC, was on the brief, for appellant Davis.

' Alyse Graham, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr. and Margaret Carroll, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, GLICKMAN and WASHINGTON, Associate Judges.

STEADMAN, Associate Judge:

Late one summer evening, appellants were crossing Duke Ellington Bridge in a car. They accosted two women walking along the bridge and robbed and pistol-whipped one of the women.

The principal issues on appeal have to do with the trial court's refusal to suppress evidence of "show-up" identifications and the contents of a clutch purse seized on a "plain view" theory. Both involve somewhat unusual factual features. First, the show-up identifications were made not only at the scene of the original detention of appellants a few minutes after the event, but also an hour later at the hospital where the beaten woman had been taken for treatment. Second, an identification card in the name of one of the women was spotted by an officer located in a clutch purse in plain view, sitting on the front seat of appellants' car. However, the "plain view" had been created, so to speak, by another officer when, while searching the car for weapons, the officer had moved the purse from a glove compartment to the car seat and failed to place it back into the compartment after the search. Appellants raise a number of additional issues as well. We affirm.

## I.

As two female pedestrians were walking across the Duke Ellington Bridge from

Adams Morgan to Connecticut Avenue shortly after midnight on August 23, 1996, a car approached. Men in the car made harassing comments to the women, which they ignored. As the women continued to walk away, the car cut in front of them. A man alighted from the vehicle, brandishing a weapon. One pedestrian, Ms. Moriconi, ran across the street to avoid the car, and hid behind a street light. But the other pedestrian, Ms. Dizon, remained and was faced by the assailant directly. The assailant pointed the gun at her and grabbed her clutch purse away from her. The man then hit her in the face with the gun, saying "I don't like your attitude, bitch," and got back into the car. The car drove away, passing within seven feet of Ms. Moriconi.

Police responded shortly thereafter and were given descriptions of the assailant and the driver, as well as the car they drove. The police broadcast a lookout for the car and for the two men, one of whom was said to be armed. In a matter of minutes, an officer spotted a car matching the description, heading the wrong way with its lights off on California Street, in the vicinity of the crime. The officer tried to pull the car over, but the car sped away. After a short chase, the car was eventually stopped by another police cruiser at Kalorama Circle. Several officers were on the scene as the car was stopped and the passenger, who was appellant Maddox, and the driver, who was appellant Davis, were removed from the vehicle.

While Maddox and Davis were secured, another officer, Officer Felicia Toronto, searched the car for weapons. The glove compartment was open, so the officer looked inside and removed a clutch purse that was obstructing her view of the compartment. The officer placed the purse on the passenger seat and continued to search, but did not find a weapon. She left the purse, apparently open, on the seat.

Detective Hugh Carew then came to the scene and observed, through the window of the car, the open purse and an exposed identification card of Debra Dizon. He called an officer at the scene of the crime to confirm whether one of the complainants' names matched that of the identification on the passenger seat. After finding that the identification did indeed match the name of the victim, he seized the purse.

While Ms. Dizon was taken to a local emergency room for treatment for a serious gash inflicted by the assailant's weapon which required at least 40 stitches, Ms. Moriconi was escorted from the crime scene to the spot where the car was stopped to determine whether the men stopped could be identified as the perpetrators. Prior to arriving, she was informed that two men fitting her general description had been found. There, she identified appellant Maddox as the assailant and appellant Davis as the driver of the car involved in the incident. Approximately an hour later, the police brought Maddox to the hospital where Ms. Dizon was being treated. There, she identified Maddox as the assailant.

Pre-trial, the trial court denied appellants' motions to suppress evidence of these identifications by the two victims. The court likewise denied a motion to suppress the clutch purse and its identification card.

Subsequently, a jury found Maddox guilty of armed robbery under D.C.Code §§ 22–2901, –3202, and possession of a firearm while committing a crime of violence under D.C.Code § 22–3204(b). The jury also found Maddox guilty of assault with a deadly weapon as a lesser included offense of aggravated assault while armed under D.C.Code §§ 22–504.1, –3202, and Davis guilty of the same offense as an aider and abettor.

There are seven distinct issues in this appeal. Both Maddox and Davis appeal their convictions on the bases that (1) the identification card and the purse were improperly admitted because they were not properly in plain view, nor were they inevi-

tably discoverable, and (2) the out-of-court "showup" identification by Ms. Moriconi was improperly admitted because it was unduly suggestive and not otherwise reliable. Maddox argues that (3) his out-of-court identification by Ms. Dizon was likewise improperly admitted for the same reasons. Maddox also argues that (4) his assault count merges into the armed robbery count, (5) there was insufficient evidence to support the armed element of his convictions, and (6) the jury instruction regarding the assault with a deadly weapon charge constructively amended the indictment against him by allowing the jury to find he possessed a weapon other than a pistol. In addition to the mutual claims, appellant Davis argues that (7) there was insufficient evidence to convict him as an aider and abettor to the assault with a deadly weapon. We reject all of appellants' arguments.

## II.

■ We address first the seizure of the purse and its contents. On appeal from a denial of a motion to suppress, deference must be given to the trial court's findings of fact, but review of the trial court's legal conclusions is de novo. *Davis v. United States*, 724 A.2d 1163, 1167 (D.C. 1998); *Womack v. U.S.*, 673 A.2d 603, 607 (D.C.1996), *cert. denied*, 519 U.S. 1156, 117 S.Ct. 1097, 137 L.Ed.2d 229 (1997). Moreover, the evidence presented at the suppression hearing must be viewed in the light most favorable to the prevailing party, here the government, and this court must draw all reasonable inferences in that party's favor. *Womack*, 673 A.2d at 607.

At the suppression hearing, the motions court found that police officers witnessed appellants' car traveling the wrong way down a one-way street with its lights off at night, and that the car matched a lookout description broadcast over police radios minutes prior to the sighting. The car was stopped after a short chase and, once the appellants were removed, an officer conducted a search of the car "solely for the purpose of looking for a weapon." That officer removed a clutch purse from the glove compartment, but did not "inspect the ... purse." Subsequently, another officer observed the purse and exposed identification card in plain view and, after confirming that the identification card was that of the victim, retrieved the purse.

■ The touchstone of the Fourth Amendment is reasonableness. Based on the facts here, we conclude that the police acted within constitutional bounds. *United States v. Watson*, 697 A.2d 36, 39 (D.C. 1997) ("The reasonableness of a search or seizure must be judged against an objective standard, that is, whether the facts available to the police officer at the moment of seizure warrant a man of reasonable caution in the belief that the seizure was reasonable.") (quotations omitted). First, the stop of the vehicle was permissible. While a stop of an automobile is certainly justified by probable cause, an "investigatory stop [of a vehicle] is also permissible if the police have a reasonable suspicion of criminal activity." *Russell v. United States*, 687 A.2d 213, 214 (D.C. 1997). Here, the obvious traffic violations alone were enough to meet the higher standard of probable cause to justify the stop. *Id.* (holding "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred") (quoting *Whren v. United States*, 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). Even absent the violations, however, there existed at least a reasonable suspicion of criminal activity because the description of the car given in the police broadcast was substantially identical to the car driven by appellants. *See Turner v. United States*, 623 A.2d 1170, 1173–74 (D.C.1993) (holding that reasonable suspicion existed to stop car in same area as broadcast description even though license plate did not match broadcast description).

Second, following the stop, the officers were justified in searching the vehicle for weapons. A limited search of a car for weapons is constitutional where the police have a "reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Turner, supra,* 623 A.2d at 1171 (quoting *Michigan v. Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Here, the broadcast description which had identified the model and color of appellants' car had also identified the occupants as armed and dangerous. Therefore, the officers had the reasonable suspicion necessary to justify a *Terry* search of the appellants and their car for weapons—including those areas where a weapon could be stored for easy and immediate access, such as the glove compartment. *Id.* at 1172–75 (holding search of rear quarter panel, akin to a locked glove compartment, valid in a *Terry* search, where suspect's car substantially matched police and FBI descriptions of car linked to a planned shooting). The incidental movement of the purse from the glove compartment, where it was obstructing the officer's search, to the car seat, was not unreasonable. *See, e.g., New York v. Class,* 475 U.S. 106, 117–19, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (holding officer's movement of papers to reveal vehicle identification number reasonable). The minor relocation of the purse is constitutionally indistinguishable from an officer opening a container, or unlocking a compartment— the former, like the latter actions, was a reasonably unintrusive police action necessary to complete a protective *Terry* search, and is therefore justified under the same principles. *See, e.g., Turner, supra* (removing the interior quarter panel of automobile was within reasonable scope of search under *Terry* and *Long* ).

The only question remaining, then, is whether a lawful search that "displaces" some items, which are later observed in "plain view" by another officer, must be excluded for the sole reason that the first officer did not put the item back where it had been found.

"The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). When a defendant seeks to suppress evidence seized in plain view, he must therefore demonstrate that there was an unreasonable invasion of privacy *prior to* the creation of the "plain view." Because such a search "does not involve an intrusion on privacy[,] [i]f the interest in privacy has been invaded, the violation must have occurred before the object came into plain view." *Horton v. California,* 496 U.S. 128, 141, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Hicks v. United States,* 705 A.2d 636, 640–41 (D.C. 1997) (holding "officer must have prior justification for the initial intrusion"). "The plain view exception also requires ... that the 'incriminating character' of items seized be 'immediately apparent.'" *Hicks, supra,* 705 A.2d at 640 (quoting *Horton, supra,* 496 U.S. at 136–37, 110 S.Ct. 2301 (1990)). Here, there was no initial violation, and the second officer had probable cause to seize the purse.

Detective Carew's visual "access" to the purse was justified by the valid stop and the subsequent search of the car, previously described. The confirmation that the purse was involved in the crime gave that officer "probable cause to suspect that the [purse was] connected with criminal activity." *Andreas, supra,* 463 U.S. at 771, 103 S.Ct. 3319 Even without the check of the victim's name, a woman's identification card and purse in the appellants' car was immediately incriminating in light of the

recent broadcast of the robbery. *Dickerson v. United States*, 677 A.2d 509, 514 n. 5 (D.C.1996) ("An officer must possess probable cause that the item is contraband or evidence of a crime to seize the object lawfully."); *Jackson v. United States*, 404 A.2d 911, 920 (D.C.1979) (holding officer had probable cause to seize a green blanket from suspect's car, where previous description to officer described a green blanket as stolen).

█ Under these circumstances, we think the "plain view" doctrine logically extends to the items that came into view as a result of the legitimate action by other police officers. *See, e.g., United States v. Menon*, 24 F.3d 550, 560–61 (3rd Cir.1994) (seizure of documents that were not described in search warrant was not illegal because the legal search brought those documents into plain view). *Cf. United States v. Jacobsen*, 466 U.S. 109, 119–23, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (where employees of common carrier had opened package and seen bags of white powder and then replaced the bags, subsequent government seizure of the bags did not constitute a new search, since it "enabled the agent to learn nothing that had not previously been learned during the private search"). While it is true that if the searching officer had promptly replaced the purse in the glove compartment, "plain view" would have disappeared, we do not think that the validity of the seizure can turn upon such details of an officer's tidiness in conducting a search so that she had a constitutional duty to return the item to where it was originally found.[1]

Appellants' reliance on *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), is quite unpersuasive. There, officers responding to reports of gunshots in an apartment, entered a residence to search for the shooter, weapons, or victims. *Id.* at 323, 107 S.Ct. 1149. While there, an officer noticed expensive stereo equipment, which he assumed was stolen. *Id.* at 323–24, 107 S.Ct. 1149. He therefore read and recorded the serial numbers of the components, manipulating some of the equipment, to do so. *Id.* The Supreme Court held that the officers did not have legal justification to move the equipment, and therefore the serial numbers thus brought into view could not lead to admissible evidence. *Id.* at 325, 107 S.Ct. 1149. Here, however, the officer had a legal right to move the purse to search for weapons. Because the purse was then validly placed on the seat, the second officer's subsequent sighting and physical seizure of the purse as evidence of a crime was proper.[2]

### III.

█ Both appellants challenge the refusal to suppress their identifications at the show-up immediately following their detention and appellant Maddox challenges the subsequent show-up at the hospital where he was identified by the pistol-whipped victim. The standard for such pretrial suppression is well settled:

1. We note a certain obscurity of the record regarding the precise details of the purse and its contents. Detective Carew simply testified that he "saw the purse and identification in it" on the front seat, and the trial court refers to "identification cards" in the plural as being in plain view. Exactly whether, or how, the clutch purse (sometimes referred to as a "wallet") came to be open on the seat, or whether it needed to be open at all in order to see the identification is unclear. What is clear, however, is that the identification was not deliberately exposed by the searching officer. Further, there was no claim of intentional manipulation of the purse, or of any reckless or negligent actions on behalf of Officer Toronto in conducting the *Terry* search.

2. Given our conclusion that the seizure of the purse was proper under the plain view doctrine, we need not address the trial court's alternate ground, most probably a correct one as well, that the purse would have been inevitably discovered in any event. *See, e.g., Brockington v. United States*, 699 A.2d 1117, 1119 n. 3 (D.C.1997) (routine inventory search would have revealed evidence).

To prevail on a motion to suppress a pretrial identification, a defendant must satisfy the oft-repeated, two-part test for such due process claims. First, the defendant must establish that the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Turner v. United States,* 622 A.2d 667, 672 n. 4 (D.C.1993) (quoting *Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). Second, if the procedure is found impermissibly suggestive, the government may defeat the motion and save the identification by carrying the burden of producing evidence to show that, under all the circumstances, the identification was reliable nonetheless.

*United States v. Brown,* 700 A.2d 760, 761 (D.C.1997).

■ In particular, we have noted that single-suspect identifications in the presence of police in connection with a detention, similar to the kind conducted here, are always somewhat suggestive. *Singletary v. United States,* 383 A.2d 1064, 1068 (D.C.1978). Nevertheless, a prompt showup identification "enhances ... reliability" and serves a purpose to "exonerate an innocent person who has been mistakenly apprehended." *United States v. Hunter,* 692 A.2d 1370, 1375 (D.C.1997). With these standards in mind, we conclude that neither showup identification procedure was impermissibly suggestive.

### A.

■ Appellants' argument that Ms. Moriconi's identification was impermissibly suggestive is not borne out in the record, and is refuted by its close spatial and temporal proximity to the crime. *Hunter, supra,* 692 A.2d at 1375; *Wilkerson v. United States,* 427 A.2d 923, 927 (D.C. 1981). The police officers took specific precautions to diminish any suggestiveness, while maintaining the expediency relevant to the justifications of showup identifications. In addition, the circumstances surrounding the identifications were not conducive to a very substantial likelihood of misidentification.

Ms. Moriconi had an opportunity to view the defendants, both from across the street while the crime took place, and as the car drove past her on the well-lit street. She was able to give a description of the appellants to the police shortly after the crime. Within minutes of the incident, she was informed that police had apprehended two individuals that generally matched her description. She was then taken a short distance, where each appellant was individually brought into view with a single police escort, who said nothing to the witness. The witness immediately identified each appellant and indicated the specific role they had played in the crime (i.e., driver and passenger).

■ Nothing in this scenario leads to the conclusion that the showup was unduly suggestive. Although there were indicia of police custody, "something more egregious than mere custodial status is required to establish ... unfairness." *Singletary, supra,* 383 A.2d at 1068. *See also, e.g., Lyons v. United States,* 514 A.2d 423, 431 (D.C.1986) (handcuffs and police custody not unduly suggestive); *(Gilbert) Jones v. United States,* 277 A.2d 95, 97 (D.C.1971). Furthermore, no impermissible statements were made to the witness prior to the identification. *See Singletary, supra,* 383 A.2d at 1068–69 (statement "we got two guys in the car similar to the ones you told us about" made by officer, not unduly suggestive). Although appellants' car was in the background during the identification, its mere presence did not create undue suggestiveness. *See, e.g., Fields v. United States,* 484 A.2d 570, 574 (D.C. 1984) (showup identification procedure not unduly suggestive where defendant was taken to scene of the robbery by police ten minutes after it was committed, although defendant was wearing handcuffs, and witnesses were unable to identify defendant before he was made to put on jacket and

cap that he had allegedly worn during commission of the crime).

### B.

■ Applying the same standards to the identification made by Ms. Dizon, we agree with the trial court that the identification procedure was not "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Brown, supra*, 700 A.2d at 760. To begin with, Ms. Dizon had an opportunity to view her assailant face-to-face on the well-lit street. She was able to give a description to the police which led them to believe appellant Maddox was the perpetrator. She freely admitted that she would not be able to identify the driver. Prior to the showup, she was informed only that two suspects had been stopped, and that she would view one individual. Despite her facial wound, she was coherent, and immediately identified appellant Maddox as her assailant by his clothing, build, height, hair, and general demeanor.

Similar to Ms. Moriconi's identification, the identification of appellant Maddox by Ms. Dizon was concluded in reasonably close time and proximity to the crime. *See Hunter, supra*, 692 A.2d at 1375; *Wilkerson v. United States*, 427 A.2d 923, 927 (D.C.1981). Approximately one hour had lapsed from the time of the crime to the identification at Georgetown Hospital,[3] some 15 blocks or so from the crime scene and the place of appellants' detention. Due to the injury Ms. Dizon sustained, the transport of Maddox was a reasonable alternative to bringing Ms. Dizon to the scene. Despite the handcuffs Maddox wore, and the possibility that Ms. Dizon saw him transported in a police cruiser, police action under the circumstances was not so unreasonable as to create any inherent unreliability, given that Maddox was escorted by a single officer and no improp-

erly suggestive statements were made to Ms. Dizon prior to the identification. *Lyons, supra*, 514 A.2d at 431 (handcuffs and police custody not unduly suggestive); *Singletary, supra*, 383 A.2d at 1068–69 (police statements not improper). Under these circumstances, there is little question that had Ms. Dizon been the only witness to the crime, transporting Maddox within one hour of the assault and robbery to the hospital where she was being treated would not be unduly suggestive. *United States v. (Rodney) Brown*, 700 A.2d 760, 763 (D.C.1997) (showup at police station an hour after officers observed suspect was not unduly suggestive due to exigent circumstances). *See also* LaFave, Criminal Procedure § 7.4(f) (showups need not take place at scene of crime, and may be justified even when several hours elapse after the crime) (citing, for example, *People v. Drayton*, 7 Ill.App.3d 812, 288 N.E.2d 922 (1972) (showup at witness' place of employment), and *Hoover v. Slayton*, 341 F.Supp. 317 (W.D.Va.1972) (showup three to four hours after crime)).

■ There remains, however, the argument that Ms. Moriconi's prior identifications, and the arrest of the appellants, tainted the subsequent showup at the hospital as unwarranted. However, there is nothing unique to post-arrest showup identifications in themselves that requires a different standard of analysis from those showups used to secure an arrest. Indeed, as we stated in *Garris v. United States*, "police [have a] responsibility to ascertain quickly and reliably whether the men they arrest[ ] ... [are] the perpetrators of the crime," and can fulfil that duty through prompt post-arrest showup identifications. 559 A.2d 323, 327 (D.C.1989) (rejecting argument that line-up identification was required because of amount of time between crime and showup). This is consistent with the purposes of a showup identi-

---

**3.** There is nothing in the record to support appellants' claim that the showup at the hospital occurred four hours after the crime. To the contrary, in ruling on the motion *in li-* *mine*, the trial court found as a matter of fact that the hospital identification was completed around an hour after the incident.

fication. *Turner v. United States,* 622 A.2d 667, 672 (D.C.1993) ("[I]dentifications conducted soon after the crime enhance the accuracy of witnesses' identifications and allow innocent suspects to be quickly freed.") Moreover, this treatment corresponds to the minimal constitutional protections offered an individual at a post-arrest showup. *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (Sixth Amendment right to counsel did not attach to showup after arrest because there had been no "formal charge, preliminary hearing, indictment, information, or arraignment.")

Although Ms. Moriconi's identifications provided probable cause to arrest the appellants, the police were entitled to use reasonable means to make more certain that they were arresting the right man; here, the principal perpetrator. *Garris, supra,* 559 A.2d at 327. Since Ms. Dizon had a better view of her assailant than did Ms. Moriconi, a showup identification within an hour of the crime to "cement" the previous identification was not unduly suggestive, but prudent under the circumstances. A prompt showup serves not only the victim but the accused as well, and had Ms. Dizon informed the officers that the appellant was not her assailant, a search for the real perpetrator could have begun promptly. *Turner, supra,* 622 A.2d at 672. Therefore, under the totality of the circumstances, the hospital identification was not unduly suggestive, and was properly admitted.

## IV.

We turn to appellant Maddox's three remaining issues.

### A.

▮▮▮ In addressing appellant Maddox's argument that his assault conviction merges into his armed robbery conviction, we first note that "[w]e review the issue regarding the merger of . . . convictions de novo, *Spain v. United States,* 665 A.2d 658,

661 n. 5 (D.C.1995), to determine whether there has been a violation of the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States." *Nixon v. United States,* 730 A.2d 145, 151–52 (D.C.1999). We also recite the well-settled standard of the merger doctrine:

> The Double Jeopardy Clause prohibits a second prosecution for a single crime and protects against multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717 [89 S.Ct. 2072, 23 L.Ed.2d 656] (1969). It does not, however, "prohibit separate and cumulative punishment for separate criminal acts." *Owens v. United States,* 497 A.2d 1086, 1094–1095 (D.C.1985), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). It is therefore well established that when there is "an appreciable period of time" between the acts on which two criminal convictions are based, there is no merger, even if the interval is "quite brief ."

*Gardner v. United States,* 698 A.2d 990, 1002 (D.C.1997). Therefore, whether Maddox's convictions of armed robbery and assault with a deadly weapon merge, depends on "whether there was any evidence that [Maddox] reached a 'fork in the road,' leading to a 'fresh impulse' which resulted in a separate offense." *Id.* (citing *Owens,* 497 A.2d at 1096).

▮▮▮ One of our leading merger cases, *Owens,* is particularly instructive to the present claim because that court dealt with the robbery-followed-by-assault scenario. *Owens, supra,* 497 A.2d at 1095. In that case, the court made an important distinction between those assaults "committed to effect the robbery" (which are not separable), and those that occur from a distinct impulse (which are separable). *Id.* at 1096. Examining the facts here, we are persuaded that the assault on Ms. Dizon was distinct from Maddox's robbery.

At trial, Ms. Dizon testified that after approaching her with a gun, Maddox grabbed her clutch purse. He then made a derogatory remark, calling her a bitch

with a wrong attitude, and struck Ms. Dizon in the face with the gun.[4] Ms. Dizon did not resist the robbery, nor did she attempt to impede Maddox's escape. Under these circumstances, Maddox cannot maintain that the assault was inexorably linked with the robbery. Rather, at the point he obtained possession of the purse, he confronted a classic "fork in the road" where he had a choice to leave with the robbed goods, or to "invade another interest." *Owens*, 497 A.2d at 1096. Unfortunately for Ms. Dizon, Maddox made the decision to assault her. As such, Maddox's "successive intention[ ] [made] him subject to cumulative punishment, and he must be treated as accepting that risk." *Id.* at 1095.

## B.

Next, Maddox claims that because his indictment specifically alleged he used a "pistol" in the commission of the armed robbery and the jury was so instructed, the government had the burden of presenting proof beyond a reasonable doubt that a pistol, specifically, was used. Appellant argues that mere evidence of a "gun" is insufficient evidence to prove the existence of a pistol, which, by statute, is defined as "any firearm with a barrel less than 12 inches in length." D.C.Code § 22–3201.

In assessing a claim of insufficient evidence, the court weighs the evidence in the light most favorable to the government, and gives deference to the jury with regard to the weight of the evidence, the credibility of witnesses, and inferences from fact. *Peterson v. United States*, 657 A.2d 756, 760 (D.C.1995). "[O]nly if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a

reasonable doubt," will this court reverse. *Id.*

With regards to the armed robbery and possession of a firearm charges, the instructions given to the jury by the trial judge in defining the elements of the offenses required proof that Maddox possessed a "pistol or imitation pistol," which was defined by the court as "weapon that will expel a bullet by means of explosion . . . with a barrel less than 12 inches in length."[5] At trial, there was uncontroverted testimony that Maddox had "a gun" as he approached the victim. As Maddox gripped the gun, his hands obscured the handle, but Ms. Dizon saw the barrel. Maddox's arms were extended and he pointed the gun directly at her as he was standing "about a foot away" from her. When Maddox grabbed the purse, he was able to handle the same gun with one hand.

While the proof may have been close, the evidence nonetheless supports a finding that the metallic "gun" was small enough so that its handle was obscured, that it could be held in one hand, and that someone standing only a foot away with arms extended could point the gun directly at a victim. Given these reasonable facts, an inference that the gun had a barrel of less than 12 inches was supported by the evidence and consistent with case law. *Curington v. United States*, 621 A.2d 819, 823 (D.C.1993) (no reasonable jury could fail to infer that gun used was a pistol where there was testimony of small caliber bullet); *Bates v. United States*, 619 A.2d 984, 985–86 (D.C.1993) (eyewitness testimony of silver object that "looked like a gun . . . sufficient to prove that appellant used a real or imitation pistol"); *Singley v.*

---

**4.** Ms. Dizon testified: "[Maddox hit me] [a]fter the wallet [was taken] because I remember him taking, you know, sort of giving up the wallet, you know, and letting him have it and then sort of like now what."

**5.** We note that the statutory element of armed robbery, D.C.Code § 22–3202(a), and posses-

sion of a firearm during a commission of a crime of violence, D.C.Code § 22–3204, applies to a wide range of weapons and not just a pistol. Nonetheless, for present purposes, we apply the definition of the offense as the trial court instructed the jury.

*United States,* 548 A.2d 780, 783 n. 2 (D.C. 1988) (testimony of a "little gun" sufficient to prove pistol). *Accord State v. Williams,* 231 Conn. 235, 645 A.2d 999, 1009 (1994) (evidence that "defendant pulled a 'small handgun' out of [the pocket of] his 'waist length jacket'" sufficient to support pistol conviction, despite lack of testimony on length of barrel; "it is extremely unlikely that anyone would describe as 'small' a handgun that had a barrel of one foot or longer").

### C.

Maddox also alleges that the jury instructions regarding the lesser-included offense of assault with a deadly weapon constructively amended his indictment by permitting a finding that a weapon other than a pistol was used in the crime. While the indictment alleged specifically that a pistol was involved, the jury was instructed without objection that any "dangerous weapon" was sufficient to base a conviction.[6] Since this issue was not raised below, it is reviewed for plain error. *Woodall v. United States,* 684 A.2d 1258, 1262 (D.C.1996).

"A constructive amendment occurs when the trial court permits the jury to consider, under the indictment, an element of the charge that differs from the specific words of the indictment." *Wooley v. United States,* 697 A.2d 777, 780 (D.C. 1997) (quotations omitted). However, we have pointed out that two sub-types of constructive amendments exist—those that involve factually different convictions, and those that involve legally different convictions, in relation to the original indictment. *Pace v. United States,* 705 A.2d 673, 676 (D.C.1998). Here, Maddox does not claim that the government has presented facts of a separate incident never considered by the grand jury, but rather that an amend-

ment of the original charge has broadened the scope upon which a jury could have found him guilty. "In the case where a different offense, legally understood, is alleged to have been presented to the grand jury, the test for constructive amendment is whether the structure of the statute defining the crime and the legal consequences the legislature has attached to different acts indicate that the crime charged in the indictment differs in a legally significant way from the crime of conviction." *Pace,* 705 A.2d at 676 (quotation omitted).

With regard to his aggravated assault conviction, Maddox was indicted under D.C.Code §§ 22–504.1, –3202. Neither section 22–504.1, nor section 22–3202, require, as an essential element of the crime, the possession of a pistol. Nevertheless, as Maddox points out, the indictment includes specific reference to his use of a pistol. The trial judge's instructions to the jury, however, apparently referred to the more general language of the statute, allowing the jury to convict Maddox if they found that he possessed any "dangerous weapon." Here, there was sufficient testimony regarding Maddox's possession of a pistol, *supra,* and absolutely no testimony regarding any other type of weapon, or a lack of a weapon.[7] Furthermore, a pistol is not objectively, nor statutorily, distinct from another "dangerous weapon" in the context of the charged offenses. *Meredith v. United States,* 343 A.2d 317, 320 (D.C. 1975) (finding no constructive amendment in conviction of armed robbery, where evidence showed use of "starter pistol," even though indictment alleged "pistol," because both "pistol" and "starter pistol" are "dangerous weapons"). *Cf. Wooley, supra,* 697 A.2d at 783–84 ("objective, statutory distinctions" between heroin and cocaine justified reversal as a prejudicial constructive

---

6. With respect to the charged crime, aggravated assault while armed, the trial court had charged the jury that it must find that the defendant was armed with "a pistol or an imitation pistol." Again, however, this was

more restrictive than the statute itself. See note 5, *supra.*

7. Appellant presented a defense of misidentification.

amendment). For these reasons, it is clear that Maddox "was not convicted of a different crime than that charged in the indictment" despite the trial judge's failure to include the pistol-specific language in his instructions, and that the appellant was fully "apprised of the specific acts he was alleged to have committed which would be encompassed" by the indictment. *Woodall, supra,* 684 A.2d at 1263. In any event, since the jury convicted appellant of armed robbery under instruction that required they find he possessed a "pistol," on the facts here the jury necessarily must have found that the pistol was also used in the assault.

## V.

■■■ Davis' remaining argument is that the evidence was insufficient to convict him as an aider and abettor of the assault with a deadly weapon. Davis claims that he did not "designedly encourage" the assault by Maddox, and therefore cannot be an aider and abettor. Case law, however, runs squarely against this assertion. First, the lone case Davis cites to support this reasoning, *Jones v. United States,* 625 A.2d 281, 289 (D.C.1993), in which minimal contact with the principal before and after the crime was insufficient for aider and abettor liability, has been distinguished from scenarios that resemble the case at bar. *See Kelly v. United States,* 639 A.2d 86, 91 n. 7 (D.C.1994) (driving robber away from scene of crime is significantly different from leisurely walking away with co-defendant after assault). It is clear that Davis had more than a mere coincidental contact with appellant Maddox before and after the crime.

Secondly, *Jones* itself accepts aider and abettor liability where the defendant "facilitated the crime committed." *Jones,* 625 A.2d at 289. The phrase "facilitate" is given its plain meaning, and therefore, Davis' participation as the person who drove Maddox to the scene and drove him away, undoubtedly "facilitated" the assault. *See, e.g., Smith v. United States,* 665 A.2d 962, 969 n. 9 (D.C.1995) ("There can be no serious doubt that giving the murder weapon to the murderer is conduct which facilitates the murder."); *Settles v. United States,* 522 A.2d 348, 358 (D.C.1987) (presence, flight with perpetrator, and lack of dissociation between defendant and perpetrator, sufficient to support aider and abettor liability); *Creek v. United States,* 324 A.2d 688, 689–90 (D.C.1974) (presence at scene and flight with perpetrator sufficient). Also, as the government accurately points out, Davis, as the driver, had a definite active role in the crime—slowing down as they approached the women, and cutting them off to initiate the confrontation.

■■■ Given the fact that Maddox's robbery and assault were separable crimes, however, Davis argues that he did not know, encourage or facilitate the assault, for which he was convicted, as opposed, perhaps, to the charge of robbery for which he was acquitted. He does so, despite the fact that he was the driver of the car which played such an important role in the crime. "[U]nder an aiding and abetting theory, it is well established in this jurisdiction that appellant need not have intended the particular crime which was committed by the principal in order to be liable for what occurred." *Catlett v. United States,* 545 A.2d 1202, 1216 (D.C. 1988) (quotations omitted). Rather, "a conviction based on proof that the defendant was an aider and abettor will stand if the government proves (1) that the offense was committed by someone, (2) that the accused participated in the commission, and (3) that he did so with guilty knowledge." *Lee v. United States,* 699 A.2d 373, 385 (D.C.1997) (quoting *West v. United States,* 499 A.2d 860, 865 (D.C.1985)). Therefore, the dispositive facts surrounding Davis' conviction were not whether he intended Maddox to commit the assault, or knew specifically that he would, but rather how Davis, himself, acted and in what manner he failed to act.

Most notably, Davis drove Maddox to the scene. He sat in the car, mere feet away. As Maddox got out of the car with gun drawn, Davis waited. When Maddox

returned with the clutch purse, Davis drove away. Subsequently, he led the police on a chase with Maddox still at his side. The jury could reasonably infer that he witnessed the robbery and the assault, and that he had knowledge that Maddox used a gun to perpetrate the crimes. Under these facts, a claim of insufficient evidence to support his role as an aider and abettor is unpersuasive. *See, e.g., Lee, supra,* 699 A.2d at 386 (D.C.1997) (noting that defendant did not leave the scene of the crime after initiation of murder, despite opportunity to do so, but rather stayed and helped co-defendants); *Settles v. United States,* 522 A.2d 348, 358 (D.C. 1987) ("[B]y not availing himself of opportunities to withdraw from the scene, [Lee] gave his tacit approval and encouragement to what [Chin] was doing" and was therefore an aider and abettor.); *In re D.M.R.,* 373 A.2d 235, 236–37 (D.C.1977) (lookout during robbery was also properly convicted of rape and murder, despite attempts to dissuade rapist).

The fact that Maddox was properly convicted of both robbery and assault as separate crimes does not alter this analysis. Although the assault was "another interest" pursued by Maddox and, in that limited sense, separate from the robbery, the entire criminal endeavor encompassing the assault and the robbery was clearly facilitated by Davis. *See, e.g., Lee, supra,* 699 A.2d at 385 (even where burglary was a "separate and distinct act from the killing it nevertheless may be deemed to be a continuing offense for purposes of [aider and abettor liability]") (quotations omitted).

For the foregoing reasons the convictions and sentences of Maddox and Davis are hereby

*Affirmed.*

1. On March 17, 1999, we granted respondent's unopposed petition to lift the interim