*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CM-241

IN RE WILLIE RICHARDSON, APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2019 CCC 00052)

(Hon. Maribeth Raffinan, Trial Judge)

(Argued Feb. 17, 2022            Decided  March 24, 2022[*])

*Annamaria Kimball*, appointed by this court, for appellant. *Christine Pembroke* was on the brief for appellant.

*Caroline Tan* for appellee. *Janice Y. Sheppard*, Assistant Attorney General, *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Ashwin P. Phatak*, Deputy Solicitor General, were on the brief for appellee.

Before GLICKMAN, EASTERLY, and DEAHL, *Associate Judges*.

---

[*] The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment. Upon consideration of motions to publish filed by the District of Columbia and the Legal Aid Society of the District of Columbia, we grant the motions and publish this Opinion.

DEAHL, *Associate Judge*: Willie Richardson was convicted of four counts of contempt for violating a temporary protection order (TPO). The TPO directed Richardson not to contact his ex-girlfriend, Michelle Hargrove, and he was found guilty of contempt for each of four Facebook messages he sent to Hargrove over the course of a single day. On appeal, Richardson argues that his convictions should merge because sending four messages on a single day amounts to just one offense, not four. He also argues that the trial court abused its discretion by improperly admitting prior bad acts evidence in the form of several hostile voicemails he had left on Hargrove's phone before the issuance of the TPO. We are unpersuaded by Richardson's arguments and affirm.

## I.

Richardson and Hargrove were in a relationship from January 2018 until May 2019. Shortly after their relationship ended, Hargrove sought and the Superior Court issued a TPO ordering Richardson "not [to] contact [Hargrove] in any manner," including via "electronic or social media." Weeks later, and while the TPO was in effect, Hargrove received four messages via Facebook Messenger, all sent on a single day from Richardson's Facebook account. The messages were time-stamped 2:09 PM, 3:39 PM. 7:49 PM, and 9:34 PM, and read as follows:

[2:09 PM] So you in a relationship with your new boo and you got pictures all over [your Facebook] page you and him been here and there?  Damn I was a fool for you but God bless you so you got his picture on both page as your profile huh?  I waste my time and pain over you and then you gave him my things and sit at the patio with him like he or you brought it but what woman you know of can say that she are around something that you brought me or gave me not none because I loved you enough to respect your things I'm not being around another woman with it on or at my house.  Have a blessed day and then the law suit I put you down with you share and spend it on another man and your kids wow [] but that's the thanks that I get and favor for being a dumb old ass for you

[3:39 PM] Damn I missing your ass

[7:49 PM] Look I love you more then anything and I have not been with nobody I just wish you would had really believed me but I know your new number I just did not call it?  It's 883 25 ha ha I'm not telling you the last two of your number I just gave you your space and his respect as your man because I do not want you to cheat on him just like you did me and treated me!  My love for you is so powerful to me!

[9:34 PM] I'm not here against you or betrayed you either but why you won't text back huh I love you I'm not on your time in turning people in to the law like you do I love you once again with all my heart🩵

Hargrove testified that the first message referred to a patio furniture set that Richardson insisted he had purchased for her and was angry about her using with another man.  The partial phone number in the third message was from a number Hargrove acquired after the TPO was issued—a number she did not know

Richardson had and did not want him to have. Hargrove understood the fourth message ("turning people in to the law") to refer to her obtaining a TPO against him.

Richardson was charged with four counts of contempt under D.C. Code § 16-1005(f)(1) (2021 Supp.). Before trial, the government notified Richardson of its "intent to use evidence of other crimes or prior bad acts pursuant to *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964)." Specifically, the government sought to introduce portions of three voicemails that Richardson left on Hargrove's phone between the end of their relationship and the issuance of the TPO. The government argued the voicemails were admissible as evidence of Richardson's identity as the person who sent the Facebook messages. It contended that the voicemails were relevant to Richardson's identity because, like the Facebook messages, they show the speaker was "upset by Ms. Hargrove's new relationship, and by Ms. Hargrove's continued use of the patio furniture." The government also argued the voicemails were admissible as evidence of motive because "[c]omparing these voicemails to the charged Facebook messages will demonstrate the defendant's determination to contact Ms. Hargrove to express these feelings despite her requests to end all contact." The court ruled that the voicemails were admissible as evidence of identity and motive. The court stressed that the question of identity was of particular importance because Richardson planned to argue that the Facebook messages,

though concededly sent from his account, were written by somebody else.[1]  Three

excerpts from the voicemails were eventually introduced at trial.[2]


After the close of evidence, Richardson moved to merge the four counts of

contempt into a single count, contending that the four messages—"sent within a

single day, within a fairly short amount of time"—amounted to a single offense.  The

court denied Richardson's motion, noting that although the messages were sent on

the same day, they remained "distinct messages that were sent at these four different

times . . . . at least an hour apart."  After a two-day bench trial, Richardson was

---

[1] The sole witness for the defense testified she had received multiple messages from Richardson's account but did not believe Richardson had sent them.

[2] In the three admitted voicemail excerpts, a man who Hargrove identified as Richardson can be heard saying as follows:

> The one thing I better not come through that alleyway over there any time when cutting in people's yard, when I'm cutting the yard down the street and see some dude sitting at that table.  I know that for sure.  You know I'd go to jail for that.
>
> Because you are not going to allow no man sitting at my motherfucking table.  I'll take chair by chair if I have to put them in my truck, every day I'll come and grab one, but I'm going to drag that table out there first.
>
> I'll tell you that you think I'm going to lie.  I don't give a fuck.  I'll go to jail and I'll be happy in jail, but you and another fucking nigger is not going to sit at that motherfucking table and act like a motherfucking couple.

convicted of four counts of contempt for violation of a TPO. He was sentenced to four concurrent 180-day terms of incarceration.

## II.

Richardson argues that the trial court erred by failing to merge the four contempt convictions into one, and abused its discretion by admitting Richardson's voicemails into evidence. We consider these arguments in turn.

### A.

On merger, Richardson makes two arguments. First, he argues that the four Facebook messages were part of a "single continuous episode" and should be charged as one offense under our traditional fork-in-the-road analysis. Second, and more ambitiously, he argues that the relevant provision of the Intrafamily Offenses Act prohibits multiple convictions for separate violations of a single protection order.

**i.**

"There is no double jeopardy bar to separate and cumulative punishment for separate criminal acts, even if those separate acts do happen to violate the same criminal statute." *Sutton v. United States*, 140 A.3d 1198, 1205 (D.C. 2016) (quoting *Brown v. United States*, 795 A.2d 56, 63 (D.C. 2002)). Criminal acts are "factually separate" when they "have occurred at different times and were separated by intervening events, when they occurred at different places, when the defendant has reached a fork in the road and has decided to invade a different interest, or when the first act has come to an end and the next act is motivated by a fresh impulse." *Gray v. United States*, 544 A.2d 1255, 1257 (D.C. 1988) (internal citations omitted). "An interval of time between two criminal episodes may be quite brief but still show that a defendant had reached a fork in the road or had acted in response to a fresh impulse." *Cullen v. United States*, 886 A.2d 870, 873 (D.C. 2005) (quotation marks omitted); *see also Maddox v. United States*, 745 A.2d 284, 294 (D.C. 2000) ("[W]hen there is an appreciable period of time between the acts on which two criminal convictions are based, there is no merger, even if the interval is quite brief." (quotation marks omitted)). However, when a series of criminal actions are so close together as to become "a continuous stream"—for example, a "continuous stream of threats against a single person" or "a succession of physical blows in a continuing

attack on a single victim"—those actions "coalesce into a single . . . offense." *Williams v. United States*, 981 A.2d 1224, 1227 n.8 (D.C. 2009). "Whether two charged offenses merge into one is a question of law," which we review de novo. *Ellison v. United States*, 919 A.2d 612, 615 (D.C. 2007).

We find that Richardson's messages were not part of a "continuous stream" of communication so as to constitute only one offense. The messages were separated by an "appreciable period of time," *Maddox*, 745 A.2d at 294, with each message following the preceding message by an hour-and-a-half or more. Richardson cites to no case where we have found that actions committed so far apart constituted a "continuous stream." *See Ellison*, 919 A.2d at 616 (declining to merge two counts of sexual abuse where the two sex acts were committed about fifteen minutes apart). Moreover, nothing about the content of the messages suggests that they expressed a single, continuous thought (in the way a series of punches might constitute a single, continuous attack). *See Williams*, 981 A.2d at 1227 n.8. We agree with the trial court that after Richardson sent each message he had completed a criminal act and stood at a "fork in the road" as to whether to commit another. *Gray*, 544 A.2d at 1257. He could have chosen to stop contacting Hargrove, but instead each time acted on a fresh impulse to contact her again. *Id.* Thus, under our traditional

analysis, each of Richardson's messages is punishable as a separate offense, and his convictions do not merge.

**ii.**

Our analysis does not end there because Richardson also argues that our traditional analysis does not apply to this case. In his view, the Intrafamily Offenses Act is ambiguous on the question of whether violating a single court order multiple times amounts to one or multiple offenses. The provision at issue states that "[v]iolation of any temporary protection order or civil protection order issued under this subchapter . . . shall be punishable as criminal contempt." D.C. Code § 16-1005(f)(1). Given the ambiguity he ascribes to that provision, Richardson asks us to apply the rule of lenity to interpret the Intrafamily Offenses Act as authorizing just a single conviction attendant to any given court order, no matter how many times an individual violates it.

"Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." *Ohio v. Johnson*, 467 U.S. 493, 499 (1984) (internal citations omitted); *see also Byrd v. United States*, 598 A.2d 386, 388-89 (D.C. 1991) (en banc) ("The role of the

constitutional guarantee against double jeopardy is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." (quotation omitted)). Determining the appropriate unit of prosecution is a question of statutory interpretation, *Lennon v. United States*, 736 A.2d 208, 210 (D.C. 1999), to which the rule of lenity may apply. *See Hammond v. United States*, 77 A.3d 964, 968 (D.C. 2013); *Heard v. United States*, 686 A.2d 1026, 1028 (D.C. 1996). "The rule of lenity states that 'criminal statutes should be strictly construed and that ambiguities should be resolved in favor of the defendant.'" *Coleman v. United States*, 202 A.3d 1127, 1141 (D.C. 2019) (quoting *Whitfield v. United States*, 99 A.3d 650, 656 (D.C. 2014)). However, this rule of statutory construction is triggered only if we can first say that a given "penal statute's language, structure, purpose and legislative history leaves its meaning genuinely in doubt." *Holloway v. United States*, 951 A.2d 59, 65 (D.C. 2008) (quoting *United States Parole Comm'n v. Noble*, 693 A.2d 1084, 1104 (D.C. 1997)).

According to Richardson, § 16-1005(f)(1) can (and therefore must) be read to define the unit of prosecution as the protection order itself, so that any number of violations of a single protection order amounts to just one offense. Although we have previously upheld separate punishments under § 16-1005(f)(1) for multiple

violations of a single protection order, *see, e.g.*, *In re Shirley*, 28 A.3d 506, 509 (D.C. 2011), we have never squarely considered the argument Richardson advances here.

We do not perceive the ambiguity Richardson assigns to § 16-1005(f)(1), and thus have no cause to apply the rule of lenity. Instead, the provision unambiguously permits separate punishments for each violation of a court order. The provision defines the unit of prosecution as a "violation" of a protection order. A "violation" is a discrete act, capable of repetition. *See Freundel v. United States*, 146 A.3d 375, 383 (D.C. 2016) (contrasting voyeurism, a discrete act that can give rise to separate punishments, with stalking, which is specifically defined, via statute, "as a 'course of conduct.'"). It is a basic assumption of double jeopardy jurisprudence that repeated violations of a single provision may be punished separately. *See, e.g.*, *Blockburger v. United States*, 284 U.S. 299, 302 (1932) (holding that each in a series of successive drug sales to the same individual is "a distinct offense, however closely they may follow each other"); *see also Ellison*, 919 A.2d at 616; *Brown*, 795 A.2d at 63; *Gardner v. United States*, 698 A.2d 990, 1002 (D.C. 1997).[3]

---

[3] Nor are we persuaded by Richardson's argument that "violation" does not indicate a discrete act because it is not preceded by an "article or qualifier" such as "a," "the," "every," "any," or "each." Section 16-1005(f)(1)'s statutory phrase, "[v]iolation of any temporary protection," suggests a discrete act even absent a preceding article or qualifier. Consider *Ellison*, 919 A.2d at 616, in which we upheld separate punishments for discrete violations of a provision criminalizing

Nor can Richardson point to any authority, in any jurisdiction, where a court has invoked lenity to prohibit separate punishments for *subsequent* violations of the same statute. The only authorities cited by Richardson concern whether *simultaneous* violations could be punished separately. *See Bell v. United States*, 349 U.S. 81, 83-84 (1955) (only one Mann Act offense where defendant simultaneously transported two women across state lines "for the purpose of prostitution or debauchery, or for any other immoral purpose"); *United States v. Dunford*, 148 F.3d 385, 390 (4th Cir. 1998) (only one offense where the defendant simultaneously possessed multiple firearms). The question in *Bell*, whether a "single transaction" can be subdivided into "multiple offenses" and punished separately, 349 U.S. at 84, is very different from the question here—whether discrete transactions may be

---

misdemeanor sexual abuse, despite the fact that the provision does not explicitly criminalize "a," "the," "every," "any," or "each" sexually suggestive act. Indeed, the language at issue in *Ellison* was even more amenable than here to a reading permitting only a single violation per victim. *See* D.C. Code § 22-3010.01(a) (2021 Supp.) ("Whoever, being 18 years of age or older and more than 4 years older than a child . . . engages in sexually suggestive conduct with that child or minor shall be imprisoned for not more than 180 days."). Moreover, a subsequent subsection of § 16-1005 refers back to "establishing *a* violation under subsection[] (f)," § 16-1005(h) (emphasis added), further cutting against Richardson's argument. Although it is true that in *Hammond*, 77 A.3d at 967-68, we pointed to the word "the" in "the firearm" as evidence the legislature intended the possession of each firearm to be a separate offense, that was only one piece of evidence, which we considered together with the statute's other requirements. Nothing in *Hammond* suggests that the omission of the word "the" would have been decisive the other way, especially in a case where (as here) the offenses were separated by an appreciable amount of time.

punished separately. *See also United States v. Mullins*, 698 F.2d 686, 687 (4th Cir. 1983) (distinguishing, under the same statute at issue in *Dunford*, between multiple weapons acquired in a single transaction (one offense) and weapons acquired at different times or places (separate offenses)). We are unaware of any case where we have found a statute to be ambiguous as to that second question.

Because we do not find § 16-1005(f)(1) ambiguous, the rule of lenity does not apply. We therefore agree with the trial court that separate violations of a single TPO may be punished separately, and that Richardson's convictions do not merge.

**B.**

Finally, we turn to Richardson's argument that the trial court abused its discretion when it admitted as evidence the voicemails he left on Hargrove's phone. "It is fundamental that evidence of prior bad acts independent of the crimes charged is inadmissible to show the defendant's disposition or propensity to commit the charged offenses." *Harrison v. United States*, 30 A.3d 169, 176 (D.C. 2011); *see also* Fed. R. Evid. 404(b) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). Nonetheless, evidence of prior bad acts may be admissible when used for a "substantial, legitimate

purpose" that outweighs the danger of unfair prejudice to the defendant. *Johnson v. United States*, 683 A.2d 1087, 1092 (D.C. 1996) (en banc) (quoting *Drew*, 331 F.2d at 89-90). We review the admission of other-crimes evidence for abuse of discretion. *Sanders v. United States*, 809 A.2d 584, 590-91 (D.C. 2002).

On the threshold question of whether the voicemails even qualified as prior bad acts, the trial court reasoned that they did so marginally because they were "minimally in the nature of a criminal offense" given that they were threatening. We agree, and so agree that *Drew*'s strictures apply.[4] However, we also agree with the trial court that (1) the voicemails were relevant to Richardson's motive and "the identity of the person" who committed the offense, *Drew*, 331 F.2d at 90, and (2) the prejudicial effect of admitting them did not outweigh their probative value, *id.*

Richardson contends, to the contrary, that the voicemails were not relevant to the issue of identity because his identity could have been sufficiently established by Hargrove's testimony alone. Richardson confuses relevance with strict necessity. It is true that the government had plenty of evidence that Richardson sent the Facebook

---

[4] It is Richardson who argues that the voicemails do not qualify as prior bad acts, even though that argument works against his interests as it would deprive him of *Drew*'s heightened protections against admitting such evidence. He is perhaps operating under the mistaken impression that if the evidence were not covered by *Drew*, it would somehow raise the bar to admissibility, but the opposite is true.

messages without introducing the voicemails as further evidence of that fact—the messages came from his Facebook account, after all.  But that is beside the point. The government is not confined to presenting the bare minimum of evidence sufficient to support its charges.  In assessing relevance, a trial court may consider the availability of "less risky alternative proof," *Old Chief v. United States*, 519 U.S. 172, 183 (1997), but "the mere fact that two pieces of evidence might go to the same point would not . . . necessarily mean that only one of them might come in"— particularly where such a limitation would compromise the "evidentiary richness" or "narrative integrity" of the case.  *Id*.; *see also McFarland v. United States*, 821 A.2d 348, 353 (D.C. 2003).

Here, the government had every reason to fully develop its evidence, beyond the bare minimum, that Richardson sent the Facebook messages in question. Richardson's defense to the charges was one of misidentification, specifically, that he was not the author or the Facebook messages.  *See Jackson v. United States*, 623 A.2d 571, 582 (D.C. 1993) (there "must be a legitimate, *contested* issue in the case" that the other crimes evidence is probative of before it may be admitted (emphasis added)).  The voicemails thus spoke to the central dispute in the case, as they tended to corroborate the government's narrative that Richardson sent the Facebook messages (similar in content to the voicemail messages he left).  "[W]here the

accused denies that he committed the act[,] the prosecutor is permitted, as part of his effort to prove that the particular accused did commit the act, to prove that the accused had a motive . . . ." *Bacchus v. United States*, 970 A.2d 269, 275 (D.C. 2009) (ellipses and quotation marks omitted). Moreover, "where one . . . partner in a relationship commits a crime against the other, any fact or circumstance relating to ill-feeling; ill-treatment; jealousy; prior assaults; personal violence; threats, or any similar conduct or attitude by [that partner] are relevant to show motive . . . ." *Id.* at 276 (quoting *Mitchell v. United States*, 629 A.2d 10, 13 (D.C. 1993)). Finally, we do not think the voicemails were particularly prejudicial, but share the trial court's assessment that they were only "minimally" in the nature of other crimes evidence.

## III.

We affirm the judgment of the Superior Court.

*So ordered.*